2020 IL App (1st) 172262
Nos. 1-17-2262, 1-17-2263, 1-17-2264

SECOND DIVISION
December 22, 2020

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 16CR9427 |
| | ) | |
| COMMODORE ROBERTS, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | William H. Hooks, |
| | ) | Judge Presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a bench trial, defendant Commodore Roberts was convicted of three counts of armed robbery and was sentenced to three concurrent terms of 25 years' imprisonment. Defendant appeals his convictions, arguing that he was denied his constitutional right to effective assistance of trial counsel due to his attorney's failure to file a motion to suppress an eyewitness's pretrial identification of him as the offender. For the reasons explained herein, we affirm the judgment of the circuit court.

¶ 2                                    BACKGROUND

¶ 3     During the course of a five-month time span, a Chicago restaurant was robbed five times. A police investigation ensued, and defendant was ultimately arrested in connection with those events and charged with five counts of armed robbery. Defendant waived his right to a jury trial, electing instead to proceed by way of a bench trial.

¶ 4     At trial, Saul Trujillo, a native Spanish speaker, testified through a sworn courtroom interpreter that he was working at Maxwell restaurant located at 246 South Cicero in December 2015. He described the restaurant as having a limited menu and no dine-in option; rather, customers placed their orders and were provided with food at a small sliding glass window. At approximately 12:20 a.m., on December 20, 2015, Trujillo was providing a customer with change from the cash register when defendant appeared in the window in front of him and pointed a black handgun that resembled guns that "the police officers carry" "right in [his] face." Defendant then handed Trujillo a bag and ordered Trujillo to "give [him] the money." Trujillo recalled that defendant was wearing a mask that covered the lower portion of his face. Only his eyes, nose, and upper lip were visible. He estimated that defendant was standing approximately two feet away from him when he ordered him to empty the cash register. He further estimated that the gun that defendant was pointing at him with an outstretched arm was approximately one foot away from him. Trujillo opened the register, grabbed the money, and put it into the bag that defendant had handed to him. As he was doing so, defendant reached inside the window and pointed the gun at his coworker, Daniel Ortiz.

¶ 5     Trujillo acknowledged that he was testifying through an interpreter but explained that he understood some English and was proficient enough to use English to converse with customers at the restaurant. He further confirmed that, although defendant spoke to him in English, Trujillo

understood what defendant was ordering him to do. Trujillo testified that he left his employ at Maxwell approximately one week after the robbery. He was never asked to view a photo array or a lineup. Although he did not identify defendant as the offender prior to trial, Trujillo did identify him at trial, over the objection of defense counsel, as the individual who pointed the gun at him and ordered him to empty the cash register on December 20, 2015. On cross-examination, Trujillo testified that defendant's eyes were his only features that were fully visible during the robbery; the rest of defendant's face was covered to an extent by the mask.

¶ 6     Daniel Ortiz, another native Spanish speaker, also testified through an interpreter and confirmed that he was working with Trujillo at Maxwell restaurant at the time of the December 20, 2015, robbery. Defendant, who was wearing a mask that covered a portion of his face, arrived at approximately 12:20 a.m. and pointed a "black gun like the detectives use" at them and ordered Trujillo to put money into a bag. Defendant also pointed the gun at Ortiz and ordered him to put his "face down" and not to look at him. Ortiz estimated that he was standing approximately three feet away from defendant during the robbery. Although Ortiz testified through an interpreter at trial, he testified that he understood English and was proficient enough to converse with customers in English. He was also able to understand defendant's demands that night. Ortiz testified that the robbery was over quickly and estimated that it lasted about five minutes.

¶ 7     Unlike Trujillo, Ortiz testified that he continued working at Maxwell restaurant after the first robbery. On May 12, 2016, at approximately 12:40 p.m., Ortiz was working his shift at the restaurant when the "same person *** showed up again" to rob the restaurant. On that occasion, Ortiz was working in the kitchen and his coworker, Jose Figueroa, was at the cash register. Ortiz heard a noise, and when he looked out from the kitchen, he observed defendant pointing a gray revolver at Figueroa, who then gave defendant the money from the register. Ortiz estimated that

he was approximately 10 feet away from defendant during the robbery and testified that the gun that defendant used during this robbery was different than the one he used during the December 2015 robbery. Defendant was wearing a face covering that concealed the lower portion of his face; however, everything from his upper lip to his eyebrows was visible. As a result, Ortiz testified that he was able to recognize defendant as the perpetrator. He estimated that the robbery lasted "about a minute" and that he was able to observe defendant and what he was doing during that time.

¶ 8     Several days later, on May 18, 2016, Ortiz was again working at Maxwell. At approximately 12:30 a.m., he was in the back of the restaurant and one of his coworkers was manning the front of the restaurant. Defendant approached Ortiz's coworker, pulled his revolver out, and demanded money. His coworker attempted to open the cash register; however, he was unsuccessful. Defendant then began screaming, "give me the money" and ordered them to "hurry up." After defendant threatened to "hurt" them, Ortiz walked over to the register, opened it, and gave defendant the money. Ortiz estimated that the robbery lasted "about two minutes." On that occasion, defendant's face was visible "from his lips all the way to his eyes."

¶ 9     On May 28, 2016, police officers investigating the robberies asked Ortiz to view some photographs. Ortiz met with a detective, who explained the process and informed him that the offender's picture was not necessarily included in the photo array and that he was not required to make an identification. The detective also informed Ortiz that the lineup procedure could be recorded. Ortiz signed a form acknowledging his understanding of the identification procedure. Thereafter, he viewed a photo array and identified defendant as the man who had robbed the restaurant. Ortiz further testified that the restaurant's video surveillance system recorded the May 12 and May 18, 2016, robberies. Ortiz acknowledged that he viewed the videos prior to testifying. The videos were then played in court and entered into evidence.

¶ 10     The video of the May 12, 2016, robbery shows the offender appear before the restaurant's window. The lower part of his face is covered; however, his eyes and part of his nose are visible. The offender arrives with a gun and a bag. His facial covering slips when he grabs for the bag containing the money, and his eyes and nose are completely visible. The robbery lasts approximately 40 seconds. The video of the May 18, 2016, robbery parallels that of the earlier robbery. The masked offender appears at the window. During the robbery, his facial covering slips, and his eyes and nose are visible. The robbery lasts approximately 54 seconds.

¶ 11     On cross-examination, Ortiz acknowledged that the lineup advisory form that he signed was written in English and that he cannot read English. He testified on redirect examination, however, that the contents of the form were explained to him orally before he signed it. He explained that his wife, who speaks fluent English and Spanish, was present when the police officer detailed the lineup procedure and the contents of the form and that she translated the officer's instructions to him. Ortiz's wife was not, however, present when he viewed the photo array and did not assist him in making an identification.

¶ 12     Jose Cavillo testified that he was working with Ortiz at Maxwell on May 12, 2016. At approximately 12:40 a.m., he was cooking fries when a man knocked on the window with a gun. When he looked out the window, he saw the man standing "no more than three feet" away from him and pointing "a revolver" at him. Cavillo testified that the upper portion of the man's face was visible and that he was able to see "between his eyes and the top of his lip." The man gave Cavillo a bag and instructed Cavillo to "keep looking down" and to "just hand over the money." After he emptied the contents of the register into the bag and gave it to the man, Cavillo called the police. Cavillo identified defendant in court as the man who robbed him on May 12, 2016.

¶ 13    Cavillo testified that he was "robbed again" on May 22, 2016, at approximately 4:10 a.m. He was in the back of the restaurant "chitchatting" with three of his coworkers when he "heard somebody knocking" on the front window. When he made his way to the front of the restaurant, Cavillo saw "the same guy" pointing the "same gun" at him. Defendant ordered Cavillo to give him the "paper money," "not coins." After Cavillo turned over the money, defendant left, and Cavillo called the police to report the latest robbery. Cavillo estimated that the May 22, 2016, robbery lasted "no more than four minutes." During that time, defendant's lower face was partially concealed, but Cavillo was able to view defendant's eyes, nose, and part of his lip.

¶ 14    Cavillo was working again on May 26, 2016. At approximately 2:04 a.m., he was robbed again by "[t]he same guy." This was the third time in two weeks that he had seen defendant. This time, Cavillo was standing next to the register when defendant appeared in front of him and displayed the same revolver that he had during the prior robberies. Cavillo said, "you again," and defendant replied, "yes, me again. Just give me the money. I want the whole tray." As a result, Cavillo placed the entire cash register tray containing "coins and everything" into the bag that defendant provided. Cavillo estimated that the May 26, 2016, robbery lasted approximately three to four minutes. After defendant left with the money, Cavillo again called the police to report the latest robbery.

¶ 15    The following day, detectives arrived at the restaurant when Cavillo was working and asked him to view some photographs. Before showing him the photographs, the detectives explained the procedure and that the perpetrator's picture might not be included in the array and that he should not feel compelled to make an identification. Cavillo was also informed that he had the option of having the identification procedure recorded. After signing a form indicating that he understood the identification procedure, Cavillo viewed a photo array containing six individuals,

including a picture of defendant. Cavillo identified defendant as the individual who had robbed him three times. At trial, Cavillo was shown surveillance videos that recorded the May 22 and May 26, 2016, robberies. He narrated the events recorded on screen.

¶ 16    The video recording of the May 22, 2016, robbery shows the offender arriving at the restaurant with a mask covering the lower portion of his face. The robbery lasts approximately 50 seconds. The video of the May 26, 2016, robbery shows the masked offender arriving at the restaurant. During the robbery, when the offender reaches through the window to grab the money, his mask falls, revealing his eyes, nose, and part of his mouth. The robbery lasts approximately 10 seconds.

¶ 17    On cross-examination, Cavillo acknowledged that he spoke to Majid, an employee who worked in the gas station located across the street from Maxwell, after the third robbery. Majid informed him that he knew the "guy who robbed" Cavillo. Majid explained that the gas station has a video recording system and that he observed the perpetrator before he "put[ ] something on his face" and crossed the street to rob the restaurant. The conversation occurred after Cavillo viewed the photo array and identified defendant as the perpetrator of the recent Maxwell restaurant robberies. On redirect examination, Cavillo clarified that he never viewed the gas station surveillance video and that he was not told who to identify when he viewed the photo array.

¶ 18    Detective Vincent Humphrey testified that on May 26, 2016, he was assigned to investigate the series of robberies that occurred at Maxwell restaurant on December 20, 2015, and May 12, 18, 22, and 26, 2016. He first reviewed the police reports that had been generated following the earlier robberies and then went to the restaurant, where he reviewed surveillance video captured by the restaurant's surveillance system. He also spoke to Majid Al Qaraja, an employee at a gas station located across the street from the restaurant, who showed him surveillance video captured

by the gas station's surveillance system. After speaking to Al Qaraja and reviewing the surveillance videos, Detective Humphrey focused his investigation on "[a] subject by the nickname of Tank." He subsequently "ascertained" Tank's proper name, which was Commodore Roberts. After establishing the link between defendant's name and the nickname, Tank, Detective Humphrey obtained defendant's picture and included it in a series of photo arrays, which he showed to several Maxwell restaurant employees. The employees were able to identify defendant as the perpetrator after viewing the arrays.

¶ 19 Detective Humphrey testified that defendant was subsequently arrested by other officers on May 28, 2016. After learning that defendant had been apprehended, Detective Humphrey relocated to the 15th District Police Station and met with him at approximately 5:40 p.m. that evening. Detective Humphrey first advised defendant of his *Miranda* rights. See *Miranda v. Arizona*, 384 U.S. 436 (1966). Defendant acknowledged his understanding of those rights and indicated that he was willing to waive his rights and speak to him. When Detective Humphrey explained that he was investigating multiple armed robberies, defendant "stated that I must be kidding, he had nothing to do with it." In response, Detective Humphrey relayed that there were videos of the robberies and that defendant "was depicted in those videos." He then played "excerpts" of the videos for defendant. After defendant viewed the videos, he "kind of snickered and said, half of those videos, it doesn't even look like me." When Detective Humphrey asked defendant about the "half that d[id]" look like him, defendant "just kind of got quiet and started speaking about his fiancé." After expressing his love for his fiancée and stating that he did not want to be without her, defendant "admitted to committing the [May 2016] robberies, stating that he didn't want to harm anyone, he never meant to shoot anyone, that those were not his intentions." Defendant, however, denied committing the December 20, 2015, robbery. When asked about the

gun, defendant described it as a revolver and explained that at times he would place the revolver in front of the victims to show that he did not intend to harm them and that he just wanted the money. According to defendant, the gun did not belong to him; rather, he "had tricked someone into letting him use the gun" to commit the robberies. He indicated, however, that he could try to get the police the gun "to show good faith," but that never occurred. Defendant did not provide specific monetary amounts of the proceeds he procured during each of the robberies. Instead, he just "gave general figures."

¶ 20    Detective Humphrey testified that defendant provided a second statement admitting to his role in the May 2016 Maxwell restaurant robberies to Assistant State's Attorneys Kosovo and Mitrovic. Defendant was shown video stills of the robberies, and defendant acknowledged that he was the subject depicted in the still images and signed the back of the images to "state that." The video stills that were shown to defendant during his statement were then entered into evidence. The video stills show the offender during different parts of the robberies, including images of the offender's profile and images captured of the offender when his mask slips, revealing his eyes, nose, and lips.

¶ 21    On cross-examination, Detective Humphrey testified that defendant's waiver of his *Miranda* rights was oral and that he did not sign a written form waiving his rights. Moreover, his discussion with defendant where he admitted to committing the May 2016 robberies was not recorded.

¶ 22    After presenting the aforementioned evidence, the State rested its case-in-chief. Defense counsel moved for a directed finding, arguing that the State failed to satisfy its burden of proving defendant's identity as the perpetrator of the Maxwell restaurant robberies. After hearing arguments on the motion, the court denied the defense's request for a directed finding. Thereafter,

defendant elected not to testify, and the defense rested without calling any witnesses. Both parties then delivered closing arguments.

¶ 23    After considering the evidence and the arguments of the parties, the court found that the State had proved defendant guilty beyond a reasonable doubt of the four May 2016 armed robberies. The court found the testimony of the eyewitnesses to be "credible" and noted that defendant's involvement in the robberies was depicted in videos and still photographs. Moreover, defendant acknowledged that the still images showed him committing the May 2016 robberies. The court, however, acquitted defendant of the December 2015 armed robbery, finding that the State failed to prove that defendant was the perpetrator of the earlier crime.

¶ 24    Defendant subsequently filed a posttrial motion, and the court presided over a hearing on the motion. After considering the arguments of the parties, the court ultimately reversed its finding of guilt as to the May 18, 2016, robbery. In doing so, the court was persuaded by defense counsel's argument that Ortiz's pretrial identification of defendant as the individual who committed the robbery was problematic because police officers did not provide him with a photo lineup advisory form written in Spanish; rather, the form he signed was written in English, a language he was unable to read. The court upheld its finding of guilt with respect to the May 12, 22, and 26, 2016, robberies. At the sentencing hearing that followed, the parties presented evidence in aggravation and mitigation. Following its consideration of the aggravating and mitigating evidence as well as the circumstances of the crimes, the court sentenced defendant to three concurrent terms of 25 years' imprisonment. This appeal followed.

¶ 25                                    ANALYSIS

¶ 26    On appeal, defendant argues that he was denied his constitutional right to effective assistance of trial counsel. Specifically, he submits that his attorney was ineffective for failing to

move to suppress Jose Cavillo's pretrial identification because the identification was not recorded and the procedure was thus not conducted in accordance with the requirements of section 107A-2(h) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/107A-2(h) (West 2016)).

¶ 27    The State responds that defendant's ineffective assistance of counsel claim lacks merit. Although the State does not dispute that Cavillo's pretrial identification was not conducted in accordance with the requirements of section 107A-2(h) of the Code, it submits that defense counsel's decision not to seek suppression of Cavillo's identification on that ground was not objectively unreasonable. Moreover, the State submits that defendant was not prejudiced by defense counsel's failure to file a motion to suppress.

¶ 28    It is well established that every criminal defendant has a constitutional right to receive effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; *Strickland v. Washington*, 466 U.S. 668, 685 (1984). The right to effective assistance of counsel entails "reasonable, not perfect, representation." *People v. Wilborn*, 2011 IL App (1st) 092802, ¶ 79. To prevail on a claim of ineffective assistance of trial counsel, the defendant must satisfy the two-prong test set forth in *Strickland*, 466 U.S. 668, and establish that (1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's deficient performance prejudiced defendant. *People v. Albanese*, 104 Ill. 2d 504, 525 (1984); *People v. Baines*, 399 Ill. App. 3d 881, 887 (2010). With respect to the first prong, the defendant must overcome the "strong presumption" that counsel's action or inaction was the result of sound trial strategy. *People v. Jackson*, 205 Ill. 2d 247, 259 (2001); *People v. Shelton*, 401 Ill. App. 3d 564, 583 (2010). " 'In recognition of the variety of factors that go into any determination of trial strategy, *** claims of ineffective assistance of counsel must be judged on a circumstance-specific basis, viewed not in hindsight, but from the time of counsel's conduct, and with great deference accorded counsel's

decisions on review.' " *Wilborn*, 2011 IL App (1st) 092802, ¶ 79 (quoting *People v. Fuller*, 205 Ill. 2d 308, 330-31 (2002)); see also *People v. Mitchell*, 105 Ill. 2d 1, 15 (1984) ("The issue of incompetency of counsel is always to be determined from the totality of counsel's conduct."). To satisfy the second prong, the defendant must establish that, but for counsel's unprofessional errors, there is a reasonable probability that the trial court proceeding would have been different. *People v. Peeples*, 205 Ill. 2d 480, 513 (2002). A defendant must satisfy both the performance and prejudice prongs of the *Strickland* test to prevail on an ineffective assistance of counsel claim. *People v. Evans*, 209 Ill. 2d 194, 220 (2004); *People v. McCarter*, 385 Ill. App. 3d 919, 935 (2008).

¶ 29 Generally, the decision whether to file a motion to suppress is regarded as a matter of trial strategy and is thus generally immune from ineffective assistance of counsel claims. *People v. Martinez*, 348 Ill. App. 3d 521, 537 (2004). That is because the issue of "[w]hether or not a motion to suppress should be filed in a criminal case is a matter of trial tactics and has little bearing on competency of counsel." *People v. Peterson*, 248 Ill. App. 3d 28, 38 (1993). To prevail on such a claim, a defendant must establish that there was a reasonable probability that a motion to suppress would have been granted and that the outcome of the trial would have been different had the evidence been suppressed. *People v. Givens*, 237 Ill. 2d 311, 331 (2010); *People v. Joiner*, 2018 IL App (1st) 150343, ¶ 38. If, however, filing such a motion would have been futile or the ruling on the motion would not have altered the outcome of the trial, then counsel's failure to file the motion does not amount to ineffective assistance. *Givens*, 237 Ill. 2d at 331.

¶ 30 Section 107A-2 of the Code governs lineup procedures and provides, in pertinent part, as follows:

"(h) Unless it is not practical or the eyewitness refuses, a video record of all lineup procedures shall be made.

(1) If a video record is not practical or the eyewitness refuses to allow a video record to be made:

(A) the reasons for the refusal shall be documented in the official report required under subsection (g) of this Section;

(B) an audio record shall be made, if practical; and

(C) if a live lineup, the lineup shall be photographed.

(2) If an audio record is not practical, the reasons shall be documented in the official report required under subsection (g) of this Section." 725 ILCS 5/107A-2(h) (West 2016).

¶ 31    Here, there is no dispute that Cavillo's pretrial identification of defendant was not conducted in accordance with the procedural requirements set forth in section 107A-2 of the Code. Based on the evidence presented at trial, Cavillo viewed a six-person photo array after the May 26, 2016, robbery. Defendant's picture was included in that array, and Cavillo identified him as the perpetrator of the recent robberies. Cavillo's pretrial identification, however, was not recorded in any manner, and there is no indication that a video or audio recording of the process was impractical.

¶ 32    Nonetheless, we are unable to agree with defendant's assertion that counsel's failure to seek suppression of Cavillo's pretrial identification on those grounds deprived him of his constitutional right to effective assistance of trial counsel because, even if we were to conclude that that counsel's performance in this vein was unreasonable, defendant suffered no prejudice. See *People v. Coleman*, 183 Ill. 2d 366, 397-98 (1998) (recognizing that courts "may resolve ineffectiveness claims under the two-part *Strickland* test by reaching only the prejudice component, for lack of prejudice renders irrelevant the issue of counsel's performance"). Notably, the statute does not require suppression of a witness's identification to remedy a violation of the

procedures outlined therein.[1] Subsection (j)(1) of the statute, which identifies the "consequences" of noncompliance, merely provides as follows: "Failure to comply with any of the requirements of this Section shall be *a factor* to be considered by the court in adjudicating a motion to suppress an eyewitness identification or any other motion to bar an eyewitness identification." (Emphasis added). 725 ILCS 5/107A-2(j)(1) (West 2016).[2] Indeed, this court has recognized that a violation of the procedural dictates of the lineup statute does not necessarily have an effect on the reliability of a witness's identification. See *In re N.A.*, 2018 IL App (1st) 181332, ¶ 35. Here, defendant does not suggest that the identification procedure itself was unnecessarily suggestive or challenge the reliability of Cavillo's trial testimony identifying him as the perpetrator of the May 2016 Maxwell restaurant robberies.[3] Instead, he simply argues that suppression was warranted due to law enforcement's failure to comply with the statute's recording procedures, a remedy that is not required by the statute itself. At any rate, we note that, because the cause proceeded by way of a bench trial and the court was aware that no recordings of Cavillo's pretrial identification were made, we presume that the court considered the lack of recordings when assessing Cavillo's

---

[1]Although defendant categorizes the law enforcement conduct at issue as "illegal" and argues that the conduct requires that Cavillo's pretrial identification be excluded pursuant to the "exclusionary rule," he does not acknowledge that the statute specifically addresses noncompliance and that it does not *require* that an identification be automatically suppressed where the procedural requirements of the statute are not met.

[2]The second "consequence[ ]" delineated in the statute applies in the context of jury trials. Specifically, the statute provides: "When warranted by the evidence presented at trial, the jury shall be instructed that it may consider all the facts and circumstances including compliance or noncompliance with this Section to assist in its weighing of the identification testimony of an eyewitness." 725 ILCS 5/107A-2(j)(2) (West 2016).

[3]Ordinarily, a ruling on a motion to suppress an identification involves a two-part inquiry. See *People v. Rodriguez*, 387 Ill. App. 3d 812, 829 (2008). First, the defendant has the burden of showing that the identification was so unnecessarily suggestive and conducive to misidentification that he was denied due process of law. *Id.*; see also *Joiner*, 2018 IL App (1st) 150343, ¶ 39. If the defendant meets that standard, the burden then shifts to the State to make a clear and convincing showing that the identification was a product of the witness's independent recollection. *Joiner*, 2018 IL App (1st) 150343, ¶ 39; *Rodriguez*, 387 Ill. App. 3d at 829. Given that defendant makes no argument that the identification procedure was suggestive and relies solely on the statutory violation to support his ineffective assistance of counsel claim, we need not consider the traditional two-part inquiry.

credibility and in finding defendant guilty of armed robbery. See *id.* ¶ 36 (noting that the trial court is presumed to know and properly apply the law absent affirmative evidence to the contrary). Therefore, even if counsel had filed a motion to suppress, defendant has failed to persuade this court that the motion would have necessarily been granted.

¶ 33    Nonetheless, assuming *arguendo* that a motion to suppress would have been successful, we conclude that it would have not altered the outcome of defendant's trial. In so finding, we emphasize that evidence of defendant's guilt was not limited to Cavillo's pretrial identification of him as the perpetrator. As we have mentioned, Cavillo also identified defendant at trial as the perpetrator of the May 12, 22, and 26, 2016, robberies. Moreover, Cavillo's coworker, David Ortiz, also provided eyewitness identification testimony. He also identified defendant at trial as the perpetrator of the May 12, 2016, robbery.[4] In delivering its finding, the circuit court specifically remarked that it found the witnesses' identification testimony to be "credible." In addition, video evidence and photographic evidence of each of the robberies were also admitted at trial. Although defendant wore a mask that covered the lower half of his face during his crimes, the mask slipped to his chin on multiple occasions, revealing completely his eyes, nose, and lips. Indeed, the circuit court, who was afforded the opportunity to view the video and photographic evidence as well as the defendant, himself, who appeared before the court, noted that defendant's "facial features w[ere] distinctive" and repeatedly referenced the videos and still images when it delivered its guilty finding. Finally, we note that defendant, when questioned by police about the crimes and shown still images captured by the restaurant's surveillance equipment, admitted that he committed the May 2016 robberies. Thus, even without the eyewitness identification testimony, evidence of

---

[4]We note that Ortiz also identified defendant as the perpetrator of the May 18, 2016, robbery; however, the court reversed its finding of guilty as to that specific crime during a hearing on defendant's posttrial motion.

defendant's guilt was overwhelming. Ultimately, given the totality of the State's evidence against him, we conclude that, even if defense counsel had moved to suppress Cavillo's pretrial identification and the motion had been granted, the outcome of defendant's trial would not have differed in light of the significant evidence against him.

¶ 34    In so finding, we are unpersuaded by his argument that the circuit court's ruling on his posttrial motion, in which it reversed its finding of guilt as to the May 18, 2016, robbery supports his argument that a successful motion to suppress would have likely altered the trial result. The circuit court's posttrial ruling was predicated on the fact that Ortiz, a native Spanish speaker and the only testifying eyewitness to the May 18, 2016, robbery, was not provided with a lineup advisory form written in Spanish. Given the court's concern that Ortiz's pretrial identification of defendant as the robber was potentially made absent an accurate understanding of the procedure, the court reversed its finding of guilt with respect to that charge. Here, however, there was no concern that Cavillo's pretrial identification of defendant was tainted by his failure to understand the identification procedure. Cavillo's pretrial identification was simply not recorded. The concerns the circuit court had with Ortiz's pretrial identification were not present with Cavillo's pretrial identification.

¶ 35    Accordingly, although we do not condone the failure of investigating officers to comply with the procedural requirements of section 107A-2(h) of the Code, we necessarily reject defendant's ineffective assistance of counsel claim due to his failure to establish that he was prejudiced by counsel's representation, and we affirm his armed robbery convictions. We emphasize that procedures set forth in the lineup statute are designed to protect the rights of criminal defendants as well as to preserve the integrity of police investigations. Although we conclude that a violation of the statute's procedural requirements does not warrant reversal of

defendant's conviction in this case, law enforcement's failure to abide by the statute's requirements may compel a different result in another case. We thus admonish law enforcement to follow the specific procedures outlined in the lineup statute when conducting their investigations.

¶ 36                              CONCLUSION

¶ 37    The judgment of the circuit court is affirmed.

¶ 38    Affirmed.

**Nos. 1-17-2262, 1-17-2263, 1-17-2264**

| | |
|---|---|
| **Cite as:** | *People v. Roberts*, 2020 IL App (1st) 172262 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 16-CR-9427; the Hon. William H. Hooks, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and Michael H. Orenstein, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, David H. Iskowich, and Jessica L. Wasserman, Assistant State's Attorneys, of counsel), for the People. |