2021 IL App (1st) 190894-U

SECOND DIVISION
September 14, 2021

No. 1-19-0894

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the |
| Plaintiff-Appellee, | ) ) | Circuit Court of Cook County. |
| v. | ) ) | No. 17 CR 694 |
| ALFREDO RAMOS, | ) ) | Honorable |
| Defendant-Appellant. | ) ) ) | Charles P. Burns, Judge Presiding. |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justices Howse and Cobbs concurred in the judgment.

**O R D E R**

¶ 1    *Held*: The defendant was not denied his constitutional right to effective representation of counsel where counsel's decision to forgo filing a meritless motion to suppress was a matter of sound trial strategy and the evidence at the defendant's trial overwhelmingly supported his guilt. The circuit court did not abuse its discretion in sentencing the defendant to a term only three years above the statutorily mandated minimum.

¶ 2　Following a jury trial in the circuit court of Cook County, the defendant, Alfredo Ramos, was convicted of first-degree murder and sentenced to 48 years' imprisonment. On appeal, the defendant contends that he was denied his constitutional right to effective representation when his trial counsel failed to file a motion to suppress three eyewitness identifications because those identifications were made using unnecessarily suggestive lineups and procedures and were otherwise unreliable. The defendant also asserts that the circuit court abused its discretion when it sentenced him to 48 years imprisonment because it failed to give appropriate weight to mitigating factors, including his age, background, and potential for rehabilitation. For the following reasons, we affirm.

¶ 3　　　　　　　　　　　　　　I. BACKGROUND

¶ 4　In December 2016, the defendant was arrested and charged with first degree murder for his involvement in the April 24, 2016, shooting of the victim, Justin Bowman.

¶ 5　The following evidence was adduced at the defendant's trial. The State's case was premised on the testimony of three eyewitnesses (Fernando Matias, Daniel Utterback, and off-duty Chicago police officer David Valentin), who identified the defendant as the shooter and testified to what they observed on the evening of April 24, 2016.

¶ 6　Matias first testified that between 6 and 6:20 p.m. he was parking his car on the west side of North Central Park Avenue, south of Schubert Avenue, when he observed a group of three African American men walking westbound on Schubert Avenue.  Once outside of his car, Matias also observed a Hispanic man, about six feet tall with long curly hair following the group about 10 to 15 feet behind. Matias identified the defendant in open court as the man whom he observed following the group.

¶ 7　As Matias proceeded home, he observed the group crossing Central Park Avenue on the

crosswalk, and the defendant following them across the street at an angle. Walking to the east side of Central Park Avenue Matias passed the defendant "shoulder to shoulder," about a foot away. Matias stated that he looked at the defendant for about three seconds and had a clear view of his face. In addition, he testified that before entering his house, he looked back again and observed the defendant for another two to three seconds.

¶ 8      Matias further stated that after entering his home, he immediately looked out the window in his door. It was then that he saw the defendant take a black gun from his waistband and fire several shots north. The defendant continued to walk north and then moved out of Matias's sight for about three to four seconds.

¶ 9      Matias proceeded upstairs to check on is father, and as he did so, heard more gunshots. Matias called 911 and later spoke to the police about what he saw.

¶ 10      Matias next testified that about three months after the shooting, on July 28, 2016, he was asked by the police to view a photo array. Matias acknowledged that he was unable to make an identification from that photo array and that he requested to view a live lineup instead. Five months later, on December 7, 2016, Matias was contacted by the police and agreed to view a live lineup, during which he identified the defendant as the shooter.

¶ 11      On cross-examination, Matias acknowledged that the defendant was the only person who was both in the photo array and the lineup. In addition, Matias acknowledged that his sister was inside the house at the time he observed the shooting and that she told him what she saw before he spoke to the police that night. Matias insisted, however, that everything he testified to was from his own memory, and not from what his sister had told him.

¶ 12      Daniel Utterback next testified that on April 24, 2016, he was visiting his parents' home near the intersection of Central Park and Schubert Avenues. At about 6:20 p.m., Utterback was

sitting on the home's raised front porch with his mother, sister, sister-and-law, and son, when he heard gunfire coming from the south. Utterback told his family to go inside and then looked south toward the sound of the gunfire. Utterback saw a Hispanic man, about six feet tall, medium built, with long curly hair, whom he identified in court as the defendant, running north on Central Avenue toward the southwest corner of Central Park and Schubert Avenues. According to Utterback, once at the corner, the defendant got into a "shooting position" and fired a black handgun three times down Schubert Avenue. Afterwards, the defendant ran east across Central Park Avenue with the gun still in his hand.

¶ 13    Utterback testified that he was about 150 to 200 feet away from the intersection when he observed the defendant, and that nothing was obstructing his view.

¶ 14    Utterback further averred that immediately after the shooting, he observed a black sedan "zoom" north past his family's home and toward where the defendant had just gone. Utterback did not see whether the defendant entered the sedan but presumed that he had. When the sedan drove away, Utterback walked to the corner where he had observed the defendant shooting and looked west down Schubert Avenue, where he saw people surrounding someone on the ground. Utterback did not go closer but instead looked around the corner and observed three fired cartridge casings on the ground. When the police arrived, Utterback spoke to them and showed them the cartridge casings he had found.

¶ 15    About eight months later, on December 7, 2016, Utterback was contacted by the police and agreed to view a live lineup, during which he identified the defendant as the shooter.

¶ 16     On cross-examination, Utterback admitted that he observed the shooter from the right side and saw his face and neck, which was exposed, but never told the police that the shooter had a tattoo on that side of his neck.  He also acknowledged that he initially told the police that the

shooter was of average height. In addition, Utterback admitted that in the live lineup he viewed, two of the fillers appeared shorter than average height.

¶ 17    On redirect, however, Utterback testified that it was impossible to tell from the lineup whether any of the participants were significantly taller than the rest because they were all sitting down. In addition, Utterback averred that he identified the defendant "almost immediately" based on his face and not through a process of eliminating the fillers and that he was "certain" about his identification.

¶ 18    Chicago Police Officer David Valentin next testified that on April 24, 2016, he was off duty and at his home on the second floor of the two-flat located at 2650 North Central Park Avenue. Valentin testified that he was sitting in his living room when he heard four gunshots. Valentin went to his front bay window and looked toward the intersection of Central Park and Schubert Avenues and observed a black four-door sedan pull up to the corner at a high rate of speed.

¶ 19    Valentin then heard a second series of shots, which drew his attention to the southwest corner of the intersection. There, from his side window, and with a clear and unobstructed view, he observed a six-foot tall white man, with long hair in a ponytail, whom he identified in court as the defendant. According to Valentin, the defendant was in a kneeling position firing a weapon down Schubert Avenue. After firing those shots, the defendant got up, ran toward the black sedan, and jumped into the rear passenger side door, while still holding his weapon. Valentin called 911 and reported the incident, giving the operator what he believed was the license plate number of the sedan.

¶ 20    On December 8, 2016, Valentin went to the police station to view a photo array, from which he identified the defendant as the shooter.

¶ 21    On cross-examination, Valentin acknowledged that after viewing that photo array he spoke

5

to Detective Juan Morales, who was the lead investigator in the case and whom he had previously known from work. He further acknowledged that he initially described the perpetrator as white to the police, but clarified that white referred to a subject's race while Hispanic referred to a subject's ethnic background.

¶ 22    After the testimony of the three eyewitnesses, the State presented evidence regarding the murder investigation. In that vein, Chicago Police Officer Rolly Ramirez testified that she was dispatched to the crime scene and observed the victim lying on the parkway at 3617 West Schubert Avenue with a gunshot wound to the chest. The victim was transported to Illinois Masonic hospital where he was pronounced dead.

¶ 23    Cook County medical examiner Dr. Kristen Escobar Alvarenga testified that she performed the autopsy on the victim, which revealed a gunshot entry wound to his back, and a gunshot exit wound to his chest.  Dr. Alvarenga stated that the victim died as a result of damage to his heart and bleeding into his chest cavity and opined that the manner of death was homicide.

¶ 24    Chicago Police evidence technician Officer Kenneth Krupa next testified that he processed the crime scene, photographed it, and collected evidence. He located three shell casings at 2650 North Central Park Avenue, and three shell casings at the southwest corner of Central Park and Schubert Avenues. A fired bullet was also recovered. Officer Krupa inventoried all the evidence and sent it to the Illinois State Police Crime Lab.

¶ 25    Illinois State Police forensic scientist Marc Pomerance testified that he examined the ballistic evidence collected at the crime scene and determined that all six cartridge casings were fired from the same firearm.

¶ 26    Chicago Police Detective Juan Morales next testified that he was the lead detective assigned to investigate the murder of the victim. On April 26, 2016, together with Detective

Olivares, Detective Morales followed up on the license plate that Valentin had given the 911 operator but determined that the license plate number was of no value to the investigation. Over the next several months, Detective Morales conducted multiple interviews with possible witnesses including Maria Quinones, Alexandra Batie, Jon Michael Cintron, Edgar Hernandez, Raul Martinez, Luis Rodriguez, and Fredrick Davis. Based on these interviews, by July 2016, the detective had narrowed his search to two suspects: the defendant and another individual.

¶ 27    On July 28, 2016, three months after the shooting, Detective Morales asked Matias to view two photo arrays,[1] one containing a photo of the defendant and the other containing a photo of the other suspect. The detective testified that the photo of the defendant was about four years old, because in that photo the defendant had long hair and the police wanted to make sure the photo matched the description of the suspect as best as possible.

¶ 28    According to Detective Morales, Detective Hector Alvarez, who had not been involved in the investigation, acted as the independent administrator for these two photo arrays. Matias was unable to identify anyone from the photo arrays but requested to view a live lineup. Detective Morales explained that he intended to have Matias view a live lineup as soon as he had someone in custody.

¶ 29    The defendant was arrested on December 6, 2016. On December 7, 2016, Detective Morales contacted Matias, Utterback, Valentin and another eyewitness, Virginia Vera, and asked them to view live lineups at the station that day. During those lineups, Matias and Utterback both identified the defendant as the shooter, while Vera was unable to identify anyone. An additional eyewitness, Daniel Holmes, was also asked to come to the police station but was not shown a

---

[1] These photo arrays were not admitted into evidence at trial.

lineup after he stated that he did not think he would be able to identify anyone.

¶ 30    According to Detective Morales, because Valentin was unable to come to the police station on December 7, 2016, he was asked to come the following day. On December 8, 2016, Valentin viewed a photo array from which he identified the defendant. Detective Morales explained that Valentin was shown a photo array instead of a live lineup because there were not enough Hispanic males in the lockup population that were physically similar to the defendant, and which could be used as fillers in a live lineup.

¶ 31    Detective Morales next testified that he was responsible for putting together all three live lineups that were shown to Matias, Utterback and Vera on December 7, 2016. He explained that for each lineup, he used three fillers, which came from different police station lock ups. To make the procedure as fair as possible, Detective Morales made all the individuals, including the defendant, wear jackets and baseball hats. In addition, he had them seated, and had their necks covered with tissue paper so as to hide any potential tattoos.

¶ 32    On cross-examination, Detective Morales acknowledged that the defendant was 6'2" tall and weighed 250 lbs., while the three fillers in all the live lineups were 5'6", 5'9", and 5'10" tall.

¶ 33    After being shown the Chicago Police Department's general order regarding live and photo lineups, Detective Morales acknowledged that pursuant to that order: (1) the police must avoid multiple identification procedures in which the same witness views the same suspect more than once; (2) lineups should consist of one suspect and a minimum of three, but preferably five fillers when practical; and (3) lineups should be conducted by an independent administrator unless not practical. Detective Morales testified that he always tries to follow this order, but admitted that in the instant case, he did not do so when he permitted Matias to view the defendant twice, first in

the photo array and then in the live lineup.

¶ 34    Detective Morales explained, however, that he did follow the general order by not entering the rooms with the witnesses while the lineups were being conducted. Instead, both the live and photo lineups were administered by other Chicago police detectives.

¶ 35    Specifically, Chicago Police Detective Lawrence Olivares administered the lineup viewed by Matias. Detective Olivares testified that when he conducted this identification, he was only aware that the case involved murder, but had no knowledge about any facts of the case. In addition, the detective averred that he had not previously met either the defendant or Matias and did not know which individual in the lineup was the suspect.

¶ 36    On cross-examination, both Detective Olivares and Detective Morales acknowledged that after conducting the lineup with Matias they learned that Detective Olivares had assisted Detective Morales with some aspects of the investigation on April 26 and 27, 2016. Detective Morales additionally admitted that this went against the general order requiring lineups to be conducted by independent administrators. However, both Detectives Morales and Olivares explained that at the time Detective Olivares aided in the investigation, he did not act as lead detective, did not take any notes, or generate reports and that no suspects were identified as a result of his participation in the investigation.

¶ 37    On cross-examination, Detective Olivares further admitted that during the lineup procedure Matias requested that the defendant, who was in position three, stand up and turn around and that he was accommodated in this request.

¶ 38    Chicago Police Sergeant Carrie Byrne next testified that she administered the live lineup viewed by Utterback. She averred that she was not involved in the investigation and had no knowledge of the facts of the case. Sergeant Byrne audio and video recorded the lineup procedure

after obtaining Utterback's permission and a copy of that recording was admitted at trial.

¶ 39    Chicago Police Detective Jaciento Gonzalez next testified that he administered the photo array viewed by Valentin on December 8, 2016. The photo array was done in an open area of the police station. Detective Gonzalez testified that he had never worked with or met Valentin prior to December 8. In addition, the detective had no information about the case and no knowledge of which individual in the photos was the suspect.

¶ 40    After the State rested its case-in-chief, the defendant called Virginia Vera. Vera testified that on April 24, 2016, she lived at 3604 South Schubert Avenue, near the corner of Schubert and Central Park Avenues. At about 6:20 p.m., together with a friend, Vera went outside to get something from her car. She then observed three African American men walking back and forth on the street. Feeling uncomfortable, Vera and her friend planned to go back inside, when the three men started running towards them.

¶ 41    Vera turned back and saw a man on the corner shooting a gun. She described the shooter as Hispanic, tall, and skinny and noted that he had a shiny gun. Vera was about five car lengths away and across the street. She immediately got down and screamed to her friend to do the same. Vera explained that her first instinct was to duck and protect herself, and not turn and look at the shooter.

¶ 42    When the shooting stopped, Vera saw a man lying on the ground. She spoke to the police at the scene and told them everything she knew. About eight months later, Vera was asked to come to the police station to view a lineup but was unable to make an identification.

¶ 43    After defense counsel rested and before closing arguments, the circuit court instructed the jury in the following manner, relevant to this appeal:

    "When you weigh the identification testimony of a witness, you should consider all the

10

facts and circumstances in evidence, including but not limited to the following: The opportunity the witness had to view the offender at the time of the offense. The witness' degree of attention at the time of the offense. The witness' earlier description of the offender. The level of certainty shown by the witness when confronting the defendant. The length of time between the offense and the identification confrontation. Illinois Pattern Jury Instruction, Criminal, No, 3.15 (4th ed 2000).

¶ 44    During its deliberations, the jury sent out two notes.  It first requested and was allowed to review the transcripts of the trial testimony of Matias, Utterback and Valentin. Second, the jury asked the circuit court to explain "which photo was shown to Metias [sic] in July 2016? Black & white large photo or color photos or both?" A discussion between the parties and the circuit court revealed that neither photo had been shown to Matias in July. The court therefore decided not to answer the jury's question and instead instructed the jury that it had heard all the evidence and should continue to deliberate.

¶ 45    The jury ultimately found the defendant guilty of first-degree murder. In doing so, the jury also found that the defendant had personally discharged the firearm that caused the victim's death.

¶ 46    The defendant filed a motion for a new trial arguing that: (1) the evidence was insufficient to prove him guilty beyond a reasonable doubt; and (2) the circuit court erred in not permitting his counsel to cross-examine one of the detectives about the Illinois statute regarding lineup procedures. The trial court denied the defendant's motion and the defendant proceeded with sentencing.

¶ 47    At sentencing, the State argued in aggravation that the defendant had a prior criminal background, including several misdemeanor convictions and a felony conviction for unlawful use of a weapon by a gang member, for which he received three-years imprisonment in the Illinois

Department of Corrections (IDOC). In addition, in aggravation the State read two victim impact statements by the victim's mother and sister.

¶ 48    In mitigation, the defendant called his father and cousin, both of whom testified to the defendant's good character and rehabilitative potential. Defense counsel then argued that the defendant had an unstable childhood but had earned his General Education Diploma (GED) in 2012 and had worked between 2013 and 2014. Counsel then sought the imposition of the minimum 45-year sentence, noting that upon release the defendant would be 69 years old, and that the cost of his incarceration would be at least $2 million.

¶ 49    After hearing the parties' arguments, the circuit court sentenced the defendant to 48 years' imprisonment. In doing so, the court first explained that because the jury had found that the defendant had personally discharged the firearm that killed the victim, it was required to impose an additional 25-years upon any sentence it imposed for murder. The circuit court therefore explained that by statute it was required to impose a sentence between 45- and 85-years imprisonment. The court further noted that a sentence of natural life without the possibility of parole was permissible for the offense of first-degree murder.

¶ 50    After explaining the applicable sentencing range, the circuit court nonetheless found that based on the applicable aggravating and mitigating factors, as well as the presentence investigation report (PSI), it did not believe that a sentence near the maximum or even mid-range was necessary. However, the court also found that the minimum was not warranted because the instant offense was a planned attack, and because the defendant had a prior gun-related conviction.

¶ 51    The defendant filed a motion to reconsider the sentence, which was denied. The defendant

now appeals.

¶ 52                                    III. ANALYSIS

¶ 53                          A.  Ineffective Assistance of Counsel

¶ 54    On appeal, the defendant first contends that he was denied his constitutional right to effective representation of counsel, where counsel failed to file a motion to suppress Matias's, Utterback's and Valentin's eyewitness identifications. He claims that all three identifications were made using unnecessarily suggestive procedures and were otherwise unreliable. For the following reasons, we disagree.

¶ 55    It is well established that every criminal defendant has a constitutional right to receive effective representation of counsel.  U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; *Strickland v. Washington*, 466 U.S. 668, 685 (1984). To prevail on a claim of ineffective assistance, the defendant must satisfy the two-prong test set forth in *Strickland*, 466 U.S. 668. Under that test, the defendant must establish both that: (1) counsel's performance fell below an objective standard of reasonableness; and (2) that the deficient performance prejudiced the defendant. *People v. Albanese*, 104 Ill. 2d 504, 525 (1984); *People v. Baines*, 399 Ill. App. 3d 881, 887 (2010). With respect to the first prong, the defendant must overcome the "strong presumption" that counsel's action or inaction was the result of sound trial strategy. *People v. Jackson*, 205 Ill. 2d 247, 259 (2001); *People v. Shelton*, 401 Ill. App. 3d 564, 583 (2010). " 'In recognition of the variety of factors that go into any determination of trial strategy, *** claims of ineffective assistance of counsel must be judged on a circumstance-specific basis, viewed not in hindsight, but from the time of counsel's conduct, and with great deference accorded counsel's decisions on review.' " *People v. Wilborn*, 2011 IL App (1st) 092802, ¶ 79 (quoting *People v. Fuller*, 205 Ill. 2d 308, 330-31 (2002)). To satisfy the second prong, the defendant must establish

that, but for counsel's unprofessional errors, there is a reasonable probability that the trial court proceeding would have been different. *People v. Peeples*, 205 Ill. 2d 480, 513 (2002). A defendant must satisfy both the performance and prejudice prongs of the *Strickland* test to prevail on an ineffective assistance of counsel claim. *People v. Evans*, 209 Ill. 2d 194, 220 (2004); *People v. McCarter*, 385 Ill. App. 3d 919, 935 (2008).

¶ 56    Generally, the decision whether to file a motion to suppress is regarded as a matter of trial strategy and is therefore immune from ineffective assistance of counsel claims. *People v. Martinez*, 348 Ill. App. 3d 521, 537 (2004). That is because the issue of "[w]hether or not a motion to suppress should be filed in a criminal case is a matter of trial tactics and has little bearing on competency of counsel." *People v. Peterson*, 248 Ill. App. 3d 28, 38 (1993). To prevail on such a claim, the defendant must establish that there was a reasonable probability that a motion to suppress would have been granted and that the outcome of the trial would have been different had the evidence been suppressed. *People v. Givens*, 237 Ill. 2d 311, 331 (2010); *People v. Joiner*, 2018 IL App (1st) 150343, ¶ 38. If, however, filing such a motion would have been futile or the ruling on the motion would not have altered the outcome of the trial, counsel's failure to file the motion does not amount to ineffective assistance. *Givens*, 237 Ill. 2d at 331.

¶ 57    In the present case, the defendant asserts that counsel should have filed a motion to suppress because in violation of the due process clause of the Fourteenth Amendment (U.S. Const., amend. XIV): (1) the composition of the three lineups was unduly suggestive; and (2) the police used improper and suggestive procedures to obtain all three eyewitness identifications.

¶ 58    In support, the defendant relies on the requirements of section 107A-2 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/107A-2(h) (West 2016)), which was enacted by our legislature on January 1, 2015, and governs identification procedures. *Id.* The statute sets forth

standards and protocols to be utilized by law enforcement officers during their investigative identification endeavors and mandates, relevant to this appeal, that: (1) all lineups be conducted using an independent administrator (*Id.* § 107A-2(a)(1)); (2) a lineup "be composed" in such a manner so as "to ensure that the suspected perpetrator does not unduly stand out from the fillers" (*Id.* § 107A-2(f)(3)); (3) at least five fillers be included in a live lineup (*Id.* § 107A-2(f)(3)(D)); (4) the suspected perpetrator be placed in a different position in a physical lineup or photo array for each eyewitness called upon to make an identification (*Id.* § 107A-2(f)(4)); (5) all lineup participants be asked to make "any identifying actions, such as speech, gestures, or other movements" (*Id.* § 107A-2(f)(8)); and (6) a video or audio recording of each lineup procedure be made (*Id.* § 107A-2(h)(1)(B)).

¶ 59    After a thorough review of the trial exhibits, which include photographs of the two live lineups viewed by Matias and Utterback respectively and the photo array viewed by Valentin, we find that neither the composition of the lineups, nor the procedures used by the police in obtaining the eyewitness identifications were so impermissibly suggestive that a motion to suppress on due process violation grounds would have been granted.

¶ 60    A pretrial encounter resulting in an identification will be excluded under the due process clause of the Fourteenth Amendment only when is "unnecessarily" or "impermissibly suggestive," so as to produce "a very substantial likelihood of irreparable misidentification." *Id.* (citing *People v. Moore*, 266 Ill. App. 3d 791, 796-797 (1994)). The suggestiveness requirement involves an inquiry into both the suggestiveness of the identification and the necessity of the suggestive identification. *People v. Follins*, 196 Ill. App. 3d 680, 688 (1990). The defendant bears the burden of showing that a pretrial confrontation was unduly suggestive. *People v. Hartzol*, 222 Ill. App. 3d 631, 642 (1991). If a defendant meets this burden, the State may show by clear and convincing

15

evidence that the identification was otherwise reliable because it was based on the witness' independent recollection of the event. *People v. McTush*, 81 Ill. 2d 513, 520 (1980); see also *People v. Faber*, 2012 IL App (1st) 093273, ¶ 58. In evaluating the likelihood of misidentification, courts consider the factors enumerated in *Neil v. Biggers,* 409 U.S. 188, 199-200 (1972). *Id.*; see also *People v. Richardson*, 123 Ill. 2d 322, 348 (1988).

¶ 61    In the present case, the defendant first challenges the composition of the lineups as inherently suggestive. In this regard, he claims that in violation of section 107A-2(f)(3) (725 ILCS 5/107A-2(f)(3) (West 2016)) his appearance was "starkly" different from that of the other participants in the two live lineups, viewed by Matias and Utterback, and the photo array, viewed by Valentin. He argues that in the live lineups, which were composed of only three, rather than five fillers (725 ILCS 5/107A-2(f)(3)(D) (West 2016)) he was "noticeably taller" and "lighter skinned" than the other participants, and that in the photo array he was the only "slender" person. We disagree.

¶ 62    "The law does not require that participants in a lineup be identical or near identical." *Faber*, 2012 IL App (1st) 093273, ¶ 57; (citing *People v. Johnson,* 222 Ill. App. 3d 1, 8 (1991); *People v. Gabriel,* 398 Ill. App. 3d 332, 348 (2010)); see also *People v. Simpson*, 172 Ill. 2d 117, 140 (1996) ("[p]articipants in a lineup are not required to be physically identical"). " 'It is a truism that individual facial features and hair styles and lengths differ, and this makes precise correspondence of all subjects in a photo array [or lineup] a practical impossibility.' " *Joiner*, 2018 IL App (1st) 150343, ¶ 41. Accordingly, any difference in the age or appearance of the participants goes to the weight of the identification, not to its admissibility. *People v. Peterson*, 311 Ill. App. 3d 38, 48 (1999); *People v. Saunders*, 220 Ill. App. 3d 647, 665-66 (1991).

¶ 63    Contrary to the defendant's position, an examination of the record reveals no "stark

16

differences" between the defendant and the other participants in either the live lineups or the photo array. The photo array consists of six color photographs, including the defendant's photograph in the upper right-hand position. All individuals pictured are Hispanic males, of similar apparent age. All have curly hair, dark eyes, and substantially similar face shapes and facial hair. There is little to no perceivable difference in any of the participant's skin tone.

¶ 64    Similarly, in the two live lineups all the participants are Hispanic males of similar age, who are seated and wearing baseball hats and jackets and have tissue paper around their necks to cover any tattoos. In addition, the shape of the participants' faces, their facial hair and skin tones are substantially similar. Contrary to the defendant's claim, there is no substantial difference between the defendant's height and skin tone compared to that of the other three participants. In the lineup viewed by Utterback the defendant is in the third position and seated next to an individual who is of the same height as the participant in position two. He appears a few inches taller than the participants in the first and fourth position, who appear to be close to the same height as each other. Similarly, in the lineup viewed by Matias, the defendant, who is in position three, appears to be no more than a few inches taller than the participants in the first and fourth positions. Such a meager discrepancy in the height difference does not render the lineups impermissibly suggestive. See *e.g.*, *People v. Harrison*, 57 Ill. App. 3d 9, 13 (1978) (affirming a conviction where the victim described offender as being "very tall" and the defendant was the tallest person in the lineup); *People v. Wyatt*, 23 Ill. App. 3d 587, 592 (1974) (where the defendant was 6'4" tall, while others in the lineup ranged in height from 5'9" to 6', the court found the identification was properly admitted). Accordingly, where the defendant's appearance is substantially similar to that of the other participants in both the photo and live lineups, the composition of the lineups was not unduly suggestive and any motion to suppress on this ground would have proven futile.

¶ 65    We similarly reject the defendant's contention that a motion to suppress would have been successful because the identification procedures used by the police were impermissibly suggestive. In this respect, the defendant contends that the police violated section 107A of the Code (725 ILCS 5/107A-2(a)(1), (f)(8) (West 2016)), when they permitted: (1) Matias to view the live lineup after he had already viewed a photo array, which included a photo of the defendant; (2) Detective Olivares to administer Matias's live lineup; and (3) the defendant to stand and turn upon Matias's request. In addition, the defendant complains that he was improperly placed in the same position (position number three) for both live lineups, and that neither Matias's nor Valentin's identification procedures were video- or audio-recorded. See 725 ILCS 5/107A-2(f)(4), (h)(1)(B) (West 2016)).

¶ 66    At the outset, we note that, contrary to the defendant's position, noncompliance with the statute does not automatically require suppression of a witness's identification. *People v. Roberts*, 2020 IL App (1st) 172262, ¶ 32. Instead, noncompliance is merely a factor that the trial court may consider in adjudicating a motion to suppress. *Id*. Moreover, when warranted by the trial evidence, the court must instruct the jury that it may consider noncompliance to assist in its weighing of the identification testimony of the eyewitness. *People v. N.A. (In re N.A.)*, 2018 IL App (1st) 181332, ¶ 33 (quoting 725 ILCS 5/107A-2(j)(1)-(2) (West 2018)).

¶ 67    While we agree with the defendant that the aforementioned enumerated procedures used by the police violated section 107A of the Code, the defendant has not demonstrated how these violations affected the reliability of the witnesses' identifications. This is particularly true, where the defendant received the exact remedy prescribed by the statute for such circumstances, namely that the jury be instructed to consider the statutory noncompliance in weighing the identification testimony. The record below reveals that after trial counsel extensively cross-examined the police regarding the procedures that they used in obtaining the three identifications, as well as the

department's general order detailing the mandatory rules regarding identification procedures, the jury was instructed to consider "all the circumstances under which the identifications were made, including but not limited to the procedures used or not used by a law enforcement agency" in deciding how much weight to give those identifications. See Illinois Pattern Jury Instruction, Criminal, No. 3.15A (4th ed 2000).

¶ 68     Moreover, contrary to the defendant's position, even if the procedures utilized were impermissibly suggestive, the totality of the circumstances clearly and convincingly establishes that all three identifications were based on the witnesses' independent recollections and were therefore otherwise reliable. As already noted above, when assessing identification testimony, Illinois courts use the factors set out in *Biggers*, 409 U.S. 188. These include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the identification confrontation; and (5) the length of time between the crime and the identification. *Biggers*, 409 U.S. at 199-200; *People v. Slim*, 127 Ill. 2d 302, 307-08 (1989). In evaluating the likelihood of misidentification, no one factor by itself is conclusive; rather the trier of fact must consider the totality of circumstances surrounding all the factors. *People v. Macklin*, 2019 IL App (1st) 161165, ¶ 22; *In re N.A.*, 2018 IL App (1st) 181332, ¶ 22.

¶ 69     In the present case, the totality of circumstances establishes the reliability of all three identifications. The incident occurred in daylight, and all three witnesses had ample opportunity to observe the defendant. Matias viewed the defendant's face as he walked past the defendant, "shoulder to shoulder," about a foot away.  In addition, he viewed the defendant two more times, once when he looked back before entering his house, and the second time as he looked out his front door window and saw the defendant shooting. Similarly, Utterback had an unobstructed view

of the defendant's face from his elevated front porch about 150 feet away.  Off-duty police officer Valentin similarly testified that he had a clear view of the intersection from his living room bay window about three blocks away and that his attention was focused on that intersection from the moment he heard the first gunshots, to when he observed the defendant kneeling, shooting and then escaping in the getaway vehicle.

¶ 70    In addition, contrary to the defendant's position, despite minor differences in their recollection of the offender, all three eyewitnesses consistently described the suspect as a tall Hispanic male, with long curly hair. While it is true that Valentin initially testified that the offender was white, he later clarified on cross-examination that white referred to a subject's race while Hispanic referred to a subject's ethnic background.

¶ 71    Moreover, while the identifications were made nearly eight months after the crime was committed, there is nothing in the record to suggest that the witnesses were uncertain or somehow waivered in their identifications. In fact, at least one witness, Utterback, testified at trial that he was certain of his identification and that he made that identification "almost immediately" after observing the defendant's face.

¶ 72    Under the totality of these circumstances, we find that the identifications were made on the basis of independent recollections and were therefore reliable.  As such, counsel's strategic decision to forego filing a meritless motion to suppress does not constitute ineffective representation.

¶ 73    Nonetheless, assuming *arguendo*, that the motion to suppress could have somehow been successful, we still conclude that this would not have altered the outcome of the defendant's trial. In this respect, we note that the evidence at trial was not limited to the three pretrial identifications of the defendant. Rather, all three eyewitnesses made in court identifications of the defendant as

the shooter and testified in detail to what they observed. Their testimonies corroborated each other and were further supported by the forensic evidence admitted at trial. Accordingly, the defendant cannot establish the requisite prejudice under the second prong of *Strickland*.

¶ 74    For all the aforementioned reasons, we conclude that the defendant was not denied his constitutional right to effective representation of counsel.

¶ 75                                B. Sentencing

¶ 76    The defendant next contends that the circuit court abused its discretion when it sentenced him to 48 years' imprisonment. The defendant argues that the circuit court failed to consider as mitigating evidence the fact that he was only 23 years' old when he committed the offense, that he grew up in an unstable family environment, and that he had shown rehabilitative potential. Specifically, the defendant points out that according to his PSI, his father was not present during his childhood and his family struggled financially and often moved. The defendant ran away from home when he was 13 years old and subsequently moved from Florida to Chicago by himself and joined a gang. After his incarceration, at the age of 20, the defendant left the gang obtained his GED, and then, upon release, worked for a year. Under these mitigating circumstances, the defendant contends the circuit court should have sentenced him to the minimum sentence of 45 years' imprisonment.  For the following reasons, we disagree.

¶ 77    It is axiomatic that the imposition of a sentence is a matter within the discretion of the trial court. *People v. Willis*, 2013 IL App (1st) 110233, ¶ 122; see also *People v. Fern,* 189 Ill. 2d 48, 53 (1999). Because the trial court is in a superior position to judge the credibility of witnesses and weigh the evidence at the sentencing hearing its sentencing decision is entitled to great deference and weight. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). Accordingly, a sentence will not be disturbed absent an abuse of discretion. *Willis*, 2013 IL App (1st) 110233, ¶ 122; *Stacey,* 193 Ill.

2d at 209. An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable or where no reasonable person would take the view adopted by the trial court. *People v. Johnson*, 347 Ill. App. 3d 570, 573-74 (2004).

¶ 78     The Illinois Constitution requires that "all penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. In sentencing, the trial court must consider "all factors in aggravation and mitigation, including, *inter alia*, the defendant's age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education, as well as the nature and circumstances of the crime and of defendant's conduct in the commission of it." *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002). The trial court is given great discretion in determining a sentence within the limits set by the legislature by statute. *People v. Haley*, 2011 IL App (1st) 093585, ¶ 63. Where a sentence falls within the statutorily mandated guidelines, it is presumed to be proper and will be overturned only where there is an affirmative showing that the sentence departs significantly from the "spirit and purpose of the law" or is "manifestly disproportionate to the nature of the offense." *People v. Benford*, 349 Ill. App. 3d 721, 737 (2004); see also *Willis*, 2013 IL App (1st) 110233, ¶ 123; *Fern,* 189 Ill. 2d at 54.

¶ 79     After a review of the record, we find that the circuit court by no means abused its discretion in fashioning the defendant's sentence. In Illinois a conviction for murder carries a sentencing range between 20 to 60 years' imprisonment. 730 ILCS 5/5-4.5-20(a)(1) (West 2016). Moreover, where, as here, a jury finds that a defendant personally discharged the firearm that proximately caused the victim's death, the defendant is subject to a mandatory 25-year sentencing enhancement (730 ILCS 5/5-8-1(d)(iii) (West 2016)) increasing the statutory sentencing range to 45 to 85 years' imprisonment.

¶ 80    In the present case, the circuit court imposed a 48-year sentence.  In doing so, the court noted that it had considered the evidence presented by the parties in mitigation and aggravation, as well as the information contained in the PSI. Accordingly, contrary to the defendant's position, the court was aware of both the defendant's age and the circumstances of the defendant's childhood as described in the PSI.  See *Willis*, 2013 IL App (1st) 110233, ¶ 123 ("If mitigating evidence is presented to the trial court, we are to presume, absent some indication to the contrary, other than the sentence itself, that the trial court considered it."). Moreover, in imposing the sentence, the court explicitly acknowledged the defendant's potential for rehabilitation. The court noted the defendant's family support in the courtroom and found that the witnesses were telling the truth about caring for the defendant and the positive traits they saw in him. The court held that based on the defendant's background, education, work and family history, a sentence near the maximum or even the statutory mid-range was unnecessary. Nonetheless, the court found that the minimum sentence was not warranted because the shooting was premediated, and the defendant had been previously convicted of a gun crime.  See *Willis*, 2013 IL App (1st) 110233, ¶ 123 (In balancing the interests of society against the ability of the defendant to be rehabilitated, the defendant's "rehabilitative potential *** is given less weight than the severity of the crime"); see also *People v. Brown*, 2015 IL App (1st) 130048, ¶ 41 ("a defendant's potential for rehabilitation is not given greater weight than the seriousness of the crime.").

¶ 81    At just three years above the statutory minimum, the circuit court's sentence was not only well-within the permissible sentencing range, but at the very low end of that spectrum. See 730 ILCS 5/5-4.5-20(a)(1) (West 2016); 730 ILCS 5/5-8-1(d)(iii) (West 2016). Where the sentence imposed was within the statutory range, and the circuit court considered the relevant mitigating and aggravating factors, and explained the rationale behind its sentence, we find no abuse of

discretion. *People v. Busse*, 2016 IL App (1st) 142941, ¶ 27; see also *People v. Hauschild*, 226 Ill. 2d 63, 90 (2007) (a sentence within statutory guidelines is presumptively valid); see also *People v. Tripp*, 306 Ill. App. 3d 941, 956 (1999).

¶ 82

¶ 83                                     III.  CONCLUSION

¶ 84    Accordingly, for the aforementioned reasons, we affirm the judgment of the circuit court.

¶ 85    Affirmed.