2024 IL App (1st) 230961-U

FIRST DIVISION
September 23, 2024

No. 1-23-0961

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Respondent-Appellee, | ) | Circuit Court of |
| | ) | Cook County, Criminal |
| v. | ) | Division. |
| | ) | |
| ALFREDO RAMOS, | ) | No. 17 CR 0069401 |
| | ) | |
| Petitioner-Appellant. | ) | Honorable |
| | ) | James B. Linn, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Lavin and Pucinski concurred in the judgment.

**O R D E R**

¶ 1    *Held*:   The circuit court's summary dismissal of the petitioner's postconviction petition is reversed and the matter is remanded for second-stage postconviction proceedings where the petition stated an arguable claim of actual innocence.

¶ 2    Following a jury trial in the circuit court of Cook County, in 2019, the petitioner, Alfredo Ramos, was convicted of first-degree murder and sentenced to 48 years' imprisonment. In 2023,

the petitioner filed a petition pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)). Therein, he alleged that he was actually innocent of the crime for which he was convicted. In addition, he alleged that the police had no probable cause to arrest him, such that his warrantless arrest violated both the United States' and Illinois' constitutions. See U.S. Const., amend. IV; Ill. Const. 1970, art. II, § 6. Finally, the petitioner alleged that his trial counsel was ineffective for failing to file a motion to quash arrest and suppress evidence on this basis. The circuit court dismissed his petition as frivolous and patently without merit. The petitioner now appeals contending that the circuit court erred because he stated an arguable basis for each of the aforementioned claims entitling him to second stage postconviction review. For the following reasons, we reverse and remand for further proceedings under the Act.

¶ 3                                    I. BACKGROUND

¶ 4      Because the facts and procedural history of this case are fully articulated in our decision affirming the petitioner's conviction on direct appeal (*People v. Ramos*, 2021 IL App (1st) 190894-U) a summary of the evidence adduced at trial will suffice to give context to the allegations in the petition and the evidence the petitioner attached in support of his petition.

¶ 5      The charges against the petitioner arose from the April 24, 2016, shooting of the victim, Justin Bowman, near 3617 W. Schubert Avenue, in Chicago. The petitioner was arrested eight months later, on December 6, 2016. There was no warrant for his arrest; instead, the petitioner was arrested based solely on an investigative alert issued by Detective Morales. The petitioner was subsequently identified as the person who shot the victim by three eyewitnesses. Two of the witnesses (Fernando Matias and Daniel Utterback) identified the petitioner from a live lineup, while one (David Valentin) selected his photograph from a photo array.

¶ 6      At trial all three eyewitnesses testified to what they observed on the night of the incident.

Matias first testified that while parking his car on the west side of North Central Park Avenue sometime between 6 and 6:20 p.m., he observed a group of three African American men, whom he did not recognize, crossing Central Park at Schubert heading west. Matias then observed another man, whom he described as Hispanic, about six feet tall, and with long curly hair, following the group at the same intersection but at an angle. When Matias exited his car and walked towards his house, he passed this man "shoulder to shoulder."

¶ 7    Once inside his house, Matias immediately looked out of the window towards the intersection. It was then that he observed the man he had just passed in the street take out a black gun from his waistband and fire several shots north on Central Park. Matias went upstairs to check on his father, and heard more gunshots, after which he called the police.

¶ 8    Three months after the shooting, on July 28, 2016, Matias viewed a photo array, including a photograph of the petitioner, but was unable to make an identification. Five months later, on December 7, 2016, Matias identified the petitioner from a live lineup, which contained only four individuals. On cross-examination, he acknowledged that during that lineup, he recognized the petitioner from the photo array because he was the only person who was both in the photo array and the lineup.

¶ 9    Daniel Utterback next testified that at about 6:20 p.m., on April 24, 2016, he was sitting on his parents' front porch near the intersection of Central Park and Schubert, with his mother, sister, sister-and-law, and son, when he heard gunfire coming from the south. Utterback instructed his family to go inside and then looked towards the gunfire. From about 150 to 200 feet, he observed a Hispanic man, about six feet tall, medium built, with long curly hair, wearing a maroon shirt, white shorts and white sneakers with red accents, running north on Central Park towards Schubert.

Once at the corner, the man got into a "shooting position" and fired his handgun three times.

¶ 10    About seven months later, on December 7, 2016, Utterback was contacted by the police and agreed to view a live lineup, during which he identified the petitioner as the shooter. On cross-examination, Utterback acknowledged that the lineup contained only four individuals, and that two of the three fillers appeared shorter than average height.

¶ 11    Utterback also acknowledged that during the shooting he observed the shooter's exposed face and neck from the right side, but never told the police that the shooter had a large tattoo on that side of his neck, even though evidence at trial established that the petitioner had such a tattoo. Utterback also admitted that he initially told the police that the shooter was of average height, instead of 6'2", which was the petitioner's height.

¶ 12    Chicago Police Officer David Valentin next testified that on the afternoon of April 24, 2016, he was off-duty and sitting inside his living room at 2650 North Central Park when he heard four gunshots. Valentin looked out of the window and observed a black four-door sedan pull up at the intersection of Central Park and Schubert. He then heard a second series of shots, which drew his attention to the southwest corner of the intersection. There, he observed a man in a kneeling position firing a weapon before jumping into the black sedan. Valentin described the shooter as a six-foot tall slender white man, with long hair in a ponytail, and wearing a maroon shirt and white shorts. Valentin called 911 and reported the incident, giving the operator what he believed was the license plate number of the sedan.

¶ 13    Seven months later, on December 8, 2016, Valentin went to the police station to view a photo array, from which he identified the petitioner as the shooter. On cross-examination, Valentin acknowledged that he initially described the perpetrator as white but explained that white referred to a subject's race while Hispanic referred to a subject's ethnic background. He also admitted that

he never told the police that the petitioner had any tattoos on his hands or his neck.

¶ 14    After the testimony of the three eyewitnesses, the State presented evidence regarding the murder investigation. Relevant to this appeal, Chicago Police Detective Juan Morales testified that he followed up on the license plate given to the 911 operator by Valentin and determined that it was of no value to the investigation. Over the next several months, Detective Morales conducted multiple interviews with possible witnesses including, *inter alia*, the victim's girlfriend Alexandra Batie. After speaking with Batie, the detective learned that Edgar Hernandez and Frederick Davis may have been with the victim when he was shot and that the victim had a friend, named Raul Martinez, who was presently in custody in the Illinois Department of Corrections (IDOC). By July 2016, Detective Morales had narrowed his search to two suspects: the petitioner and Julio Martinez.

¶ 15    Detective Morales testified as part of his investigation he next interviewed Hernandez and Davis. Both confirmed that they were present when the victim was shot but were unable to provide any further information. Davis was also shown two separate photo arrays containing photographs of Julio and the petitioner but could not identify anyone. Detective Morales also attempted to interview Raul in IDOC, but testified that Raul refused to speak with him

¶ 16    Detective Morales next testified that on September 6, 2019, he met with an individual named Luis Rodriguez and his attorney in Cook County jail to conduct an interview. The detective claimed that afterwards and at this point the investigation he "narrowed [his] universe of possible suspects" solely to the petitioner. Detective Morales therefore began making efforts to locate the petitioner and notified police personnel that he was a wanted person, upon which an investigatory alert was issued for the petitioner.

¶ 17    The petitioner was arrested several months later, on December 6, 2016, by officers who

had no personal knowledge of the investigation into the victim's murder.

¶ 18    Detective Morales testified that on the following morning, on December 7, 2016, he contacted four eyewitnesses (Matias, Utterback, Valentin and Virgina Vera) and asked them to view live lineups at the station. During those lineups, Matias and Utterback both identified the petitioner as the shooter, while Vera was unable to identify anyone. An additional eyewitness, Daniel Holmes, was also asked to come to the police station but was not shown a lineup after he stated that he did not think he would be able to identify anyone. Valentin could not come to the station on December 7, so was shown a photo array on the following morning from which he identified the petitioner as the shooter.

¶ 19    Detective Morales acknowledged that he was responsible for putting together all three live lineups that were shown to Matias, Utterback and Vera. He explained that for each lineup, he used three fillers, which came from different police station lock ups. He claimed that to make the procedure as fair as possible, he made all the individuals, including the petitioner, wear jackets and baseball hats. In addition, he had them seated, and had their necks covered with tissue paper so as to hide any potential tattoos.

¶ 20    On cross-examination, Detective Morales acknowledged that the petitioner was 6'2" tall and weighed 250 lbs., while the three fillers in all the live lineups were 5'6", 5'9", and 5'10" tall.

¶ 21    After the State rested its case-in-chief, the petitioner called Vera, who testified that on April 24, 2016, she lived near the corner of Schubert and Central Park. At about 6:20 p.m., together with a friend, Vera went outside to her car, which was parked directly in front of her house. Vera then saw three African American men walking back and forth on the street. Feeling uncomfortable, Vera and her friend planned to go back inside, when the three men began running "out of nowhere" towards them. Vera turned around and saw a man on the corner shooting a gun. She climbed down

6

between the door of her car and yelled for her friend to get down. Once the shooting stopped, Vera saw a man lying on the ground.

¶ 22    Vera described the shooter as a tall, skinny, Hispanic man, and noted that he had a shiny gun. She stated that she was about five car lengths away from him as he was shooting. Vera spoke to the police after the shooting and gave them the description of the offender. In December 2016, she was asked to come to the police station to view a lineup but was unable to make an identification.

¶ 23    Following deliberations, the jury found the petitioner guilty of first-degree murder. The circuit court subsequently sentenced the petitioner to 48 years' imprisonment.

¶ 24    On appeal, the petitioner argued: (1) that he was denied his right to effective representation of counsel where counsel failed to file a motion to suppress the three eyewitness identifications because those identifications were made using unnecessarily suggestive identification procedures; and (2) that the circuit court abused its discretion in sentencing him to 48 years' imprisonment. On September 14, 2021, this appellate court affirmed the petitioner's conviction and sentence. See *Ramos*, 2021 IL App (1st) 190894-U.

¶ 25    The petitioner subsequently filed the instant postconviction petition[1], alleging that: (1) his warrantless arrest by police officers acting on an investigative alert, and without any personal knowledge to suspect that he had committed the crime, violated the Illinois Constitution (Ill. Const. 1970, art. II, § 6); (2) that because the police officers lacked probable cause to arrest him in violation of the Fourth Amendment (U.S. Const., amend. IV) the fruits of his illegal arrest should have been suppressed; (3) that his trial counsel was ineffective for failing to file a motion to

---

[1] The petitioner initially filed his postconviction petition on October 26, 2022, but then moved to voluntarily dismiss it without prejudice. See 735 ILCS 5/2-1009, 5/13-217 (West 2020); 725 ILCS 5/122-5 (West 2020). We granted his request. The petitioner subsequently filed the instant petition on January 23, 2023.

suppress evidence based on his illegal arrest; and (4) that he was actually innocent.

¶ 26     In support, the petitioner attached, *inter alia*: (1) affidavits from himself and Raul Martinez; (2) numerous police reports relating to his arrest, including a report detailing Detective Morales' interview with Rodriguez; (3) Rodriguez's criminal history; and (4) a police report of the interview with Raul.

¶ 27     In his affidavit, the petitioner stated that he was innocent. He attested that sometime in 2021 he ran into Raul in IDOC custody and learned from him that Raul had witnessed the shooting and knew that the petitioner was not the shooter. The petitioner further attested that neither he nor his trial attorney were aware of Raul as a potential witness because the police report available to them at the time only stated that Raul refused to speak to the police.

¶ 28     In his affidavit, Raul stated that at about 6:30 p.m. on April 24, 2016, he was walking west on Schubert with the victim and a few other friends, when he heard someone from the corner of Central Park call out "Check it out. Who's that." Together with his friends, Raul ran back on Central Park where he noticed a Hispanic male about 5'10" to 5' 11" with a red T-shirt, white shorts and long hair in a ponytail standing a few houses down from the corner talking on his cell phone. When he noticed Raul and his friends, the man started walking away from them. Raul and his friends followed, to see who he was and what he was doing. Although he looked over his shoulder a few times, the man did not respond. When Raul and his friends got about 5 to 10 feet away, the man turned around, pulled out a gun and started shooting at them. Raul and his friends ran, but the man chased them, firing two more shots from the corner of Central Park and Schubert. Raul attested that he saw the victim fall but was too scared to stop. He did not think that the victim would die from his wounds and wanted to get out of there before the police

arrived to question and/or arrest anyone.

¶ 29     Raul further stated that sometime in July after the shooting, he was questioned by detectives inside IDOC regarding the incident and gave them the same information that he was now providing in his affidavit.

¶ 30     Raul stated that a few years later he ran into the petitioner in IDOC and discovered that the petitioner was serving a sentence for murdering the victim, which he knew could not be true. Raul told the petitioner that he was present for the shooting and knew that the petitioner was not the shooter because the shooter was not as big as the petitioner and did not have any visible tattoos. After Raul asked the petitioner why his counsel had never contacted him, the petitioner explained that his counsel was not aware that Raul could provide any information about the shooting.

¶ 31     The police reports attached to the postconviction petition, however, stated that Detective Morales attempted to interview Raul in IDOC on July 19, 2016, but that Raul told the detective that "he did not know anything and did not want to talk."

¶ 32     The attached police reports further reveal that Detective Morales issued the inventory alert seeking the petitioner's arrest solely based on his conversation with Rodriguez and not any other witness statements. The supplementary case report regarding this interview, which was not part of the common law record on direct appeal, reveals that Rodriguez was in Cook County jail awaiting sentencing for a probation violation when his attorney reached out to law enforcement to set up an interview. Rodriguez was a member of the Maniac Latin Disciple gang. In September 2016, Rodriguez spoke to the police and told them that he had heard of the shooting at Central Park and Schubert on the news and that based on the location of the shooting he was sure that the Maniac Latin Disciples were involved. Rodriguez stated that he suspected the

9

petitioner was the shooter and tried to reach him by phone, but the petitioner's phone was disconnected. Rodriguez told the police that the petitioner contacted him using a different phone on the following day and that they agreed to meet in Logan Square, where the petitioner ultimately confessed to having shot the victim.

¶ 33 On April 17, 2023, the circuit court summarily dismissed the postconviction petition as frivolous and patently without merit. In doing so, the court found that the petitioner's claims that his arrest was made without probable cause and that his trial counsel was ineffective were barred by the doctrine of waiver because they could have been raised on direct appeal. In the alternative, the court found that both claims lacked merit because the police had probable cause to arrest the petitioner. The court also found that the petitioner's arrest based upon an investigative alert did not violate the Illinois Constitution (Ill. Const. 1970, art. II, § 6) and that the petitioner did not present a viable claim of actual innocence. The petitioner now appeals.

¶ 34                                     II. ANALYSIS

¶ 35 On appeal, the petitioner asserts that the circuit court erred in summarily dismissing his postconviction petition where he made arguable claims: (1) that he was actually innocent; (2) that the police lacked probable cause to arrest him such that his warrantless arrest by officers not involved in the investigation following an investigatory alert created by Detective Morales solely after his conversation with Rodriguez violated both the United States' and Illinois' constitutions (U.S. Const., amend. IV; Ill. Const. 1970, art. II, § 6); and (3) that he was denied his right to effective representation because his trial counsel failed to file a motion to quash arrest and suppress evidence on this basis.

¶ 36 Because we find the actual innocence claim to be dispositive, we address it first.

¶ 37 The Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq*. (West 2020)) provides a three-

step process by which a criminal defendant may challenge his conviction on the basis of a "substantial deprivation of federal or state constitutional rights." *People v. Tenner*, 175 Ill. 2d 372, 378 (1997); *People v. Cotto*, 2016 IL 119006, ¶ 26; *People v. Tate*, 2012 IL 11214, ¶ 8; *People v. Edwards*, 2012 IL 111711, ¶ 21; *People v. Hodges*, 234 Ill. 2d 1, 9 (2009); *People v. Peeples*, 205 Ill. 2d 480, 509 (2002). Because a postconviction proceeding is a collateral attack on the criminal conviction, issues raised and decided on direct appeal are barred by *res judicata*, and issues that could have been raised, but were not, are forfeited. *Tate*, 2012 IL 11214, ¶ 8; *People v. English*, 2013 IL 112890, ¶ 22.

¶ 38    At the first stage of postconviction proceedings, such as here, the circuit court must independently review the petition, liberally construing it and taking the allegations as true, and determine whether " 'the petition is frivolous or patently without merit.' " *Hodges*, 234 Ill. 2d at 10 (quoting 725 ILCS 5/122–2.1(a)(2) (West 2006)); see also *Tate*, 2012 IL 112214, ¶ 9. At this stage, the court may not engage in any factual determinations or credibility findings. See *People v. Plummer*, 344 Ill. App. 3d 1016, 1020 (2003) ("The Illinois Supreme Court *** [has] recognized that factual disputes raised by the pleadings cannot be resolved by a motion to dismiss at either the first stage *** or at the second stage *** [of postconviction proceedings], rather, [they] can only be resolved by an evidentiary hearing"); see also *People v. Coleman*, 183 Ill. 2d 366, 380-81 (1998) (Noting that the supreme court has "foreclosed the circuit court from engaging in any fact-finding at a dismissal hearing because all well-pleaded facts are to be taken as true at this point in the proceeding."). Instead, the court may summarily dismiss the petition only if it finds the petition to be frivolous or patently without merit. See *People v. Ross*, 2015 IL App (1st) 120089, ¶ 30; see also *Hodges*, 234 Ill. 2d at 10. A petition is frivolous or patently without merit if it has no arguable basis either in law or in fact. *Tate*, 2012 IL 112214, ¶ 9. Our supreme court has explained that a

petition lacks an arguable basis where it "is based on an indisputably meritless legal theory or a fanciful factual allegation"—in other words, an allegation that is "fantastic or delusional," or is "completely contradicted by the record." *Hodges*, 234 Ill. 2d at 11-12; *People v. Brown*, 236 Ill. 2d 175, 185 (2010); see also *Ross*, 2015 IL App (1st) 120089, ¶ 31. Where the petition makes an arguable basis of at least one claim, the entire petition must be sent back for further proceedings under the Act. See *Tate*, 2012 IL 112214, ¶ 27. Our review of the circuit court's summary dismissal of the petition is *de novo*. *Id.*, ¶ 10.

¶ 39    In the present case, for the following reasons, we find that the petitioner has made an arguable basis of actual innocence, such that he is entitled to second stage postconviction review.

¶ 40    To survive the first stage of postconviction proceedings, a petition claiming actual innocence must present evidence that is arguably (1) newly discovered; (2) material and not cumulative; and (3) of such conclusive character that it would probably change the result on retrial. *People v. Robinson*, 2020 IL 123849, ¶ 47; *People v. Sanders*, 2016 IL 118123, ¶ 24 (citing *People v. Edwards,* 2012 IL 111711, ¶ 32). Newly discovered evidence is evidence that was discovered after trial and that the petitioner could not have discovered earlier through the exercise of due diligence. *People v. Flournoy*, 2024 IL 129353, ¶ 71; *Robinson*, 2020 IL 123849, ¶ 47; *People v. Coleman*, 2013 IL 113307, ¶ 96. Evidence is material if it is relevant and probative of the petitioner's innocence. *Id*. Noncumulative evidence adds to the information that the fact finder heard at trial. *Id*. Lastly, the conclusive character element refers to evidence that, when considered along with the trial evidence, would lead to a different result. *Id*. The conclusive character of the new evidence is the most important element of an actual innocence claim. *Id*.

¶ 41    In the present case, the State asserts that the petitioner has failed to state an arguable claim of actual innocence because the evidence offered by Raul's affidavit is neither newly discovered

nor of such a conclusive character that it could probably change the result on retrial. We disagree.

¶ 42   While the State correctly points out that Raul was listed in police reports as a potential witness incarcerated in IDOC, according to those same police reports, which were available to defense counsel, Raul informed the police that he knew nothing about the shooting and refused to speak with them. In contrast, in his affidavit, Raul states that he was present for the shooting, could identify the shooter as someone other than the petitioner, and that he informed the police of this when he spoke to them in IDOC. Taking the well-pleaded allegations in the petition as true and construing Raul's affidavit in favor of the petitioner, as we must at this stage of postconviction proceedings, we find that the police's alleged failure to disclose Raul's exculpatory statement in their police report arguably would have prevented the petitioner from discovering it earlier. Accordingly, because no amount of due diligence by the petitioner could have revealed Raul's presence at the shooting, Raul's affidavit is arguably newly discovered. See *e.g.*, *People v. Wideman,* 2016 IL App (1st) 123092, ¶ 53 (knowledge of a witness alone is not dispositive of whether information is "newly discovered"; even recantation testimony can be considered "new" where the petitioner lacks evidence available at the time of trial to demonstrate that a witness is lying or withholding information); *People v. Fields*, 2020 IL App (1st) 151735, ¶ 48 ("An affidavit from a witness may be newly discovered even when the defense knew of the witness prior to trial. [Citation.]"); *People v. Williams*, 392 Ill. App. 3d 359, 369 (2009) (holding that an affidavit of a participant in a crime who had not been heard from before was newly discovered where the affiant did not provide the affidavit earlier).

¶ 43   In coming to this conclusion, we further reject the State's position that Detective Morales's testimony regarding Raul's refusal to speak with the police while in IDOC establishes that Raul's present claim to the contrary is "fantastic and delusional." Our supreme court has repeatedly held

that the fact that evidence presented by a petitioner is contradicted by the State's trial testimony does not render the evidence positively rebutted by the record. *Robinson*, 2020 IL 123894, ¶ 60. "For new evidence to be positively rebutted, it must be clear from the trial record that no fact finder could ever accept the truth of that evidence, such as where it is affirmatively and incontestably demonstrated to be false or impossible ***." *Id*. Here, a fact finder could choose to believe either Raul or Detective Morales. Accordingly, because the question boils down to witness credibility, we cannot agree with the State that Raul's statement is either "fanciful" or "completely contradicted by the record." See *Coleman*, 183 Ill. 2d at 380-81 (a circuit court is "foreclosed" from engaging in any credibility and fact-finding at the first stage of postconviction proceedings); *People v. Guerrero*, 2022 IL App (1st) 210400 ¶ 13 (" 'no factual findings of credibility determinations' " are [permitted] at the pleading stage of postconviction proceedings.' [Citation.]").

¶ 44    The State next asserts that even if we find that Raul's affidavit is "newly discovered," the evidence is nonetheless not of such a conclusive character that it would probably change the result on retrial. In support, the State argues that Raul's description of the events leading up to the shooting differs drastically from the testimony of the State's three eyewitnesses and is therefore rebutted by the record. Specifically, the State points out that unlike Raul, none of the three eyewitnesses at trial testified that the victim's group followed the shooter and that in response, he turned around and fired shots at them. We disagree.

¶ 45    As already noted above, evidence is of a conclusive character when, considered along with the trial evidence, it would probably lead to a different result. *Coleman*, 2013 IL 113307, ¶ 96. The new evidence need not be completely dispositive. *Id*. Rather, "probability, not certainty, is the key as the trial court in effect predicts what another jury would likely do, considering all the evidence,

both new and old, together." *Id*. ¶ 97. Ultimately, the question is whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt. *Id*.; *Robinson*, 2020 IL 123894, ¶ 97.

¶ 46    In the present case, contrary to the State's assertion, Raul's affidavit arguably has the potential to exonerate the petitioner. Raul, who was the victim's friend, would be the only witness to unequivocally state that he was with the victim during the shooting and that the petitioner was not the shooter. Considering that defense counsel's theory at trial was to discredit the identification of the petitioner as the shooter, by highlining the fact that the shooter had no tattoos and was much shorter than the petitioner, and by pointing out that all three eyewitness identifications were accomplished by way of unnecessarily suggestive police procedures, it is arguable that Raul's statement indicating that the petitioner was not the shooter would place the trial evidence in a different light. See *People v. Harper*, 2013 IL App (1st) 102181, ¶ 49 ("[W]here newly discovered evidence is both exonerating and contradicts the State's evidence at trial, it is capable of producing a different outcome at trial."). Although multiple witnesses testified that the petitioner was the shooter, at the first stage of postconviction review, we may not engage in an assessment of the relative weight of the evidence supporting the petitioner's conviction and the evidence which exonerates him. See *People v. White*, 2014 IL App (1st) 130007, ¶ 29 (a reviewing court is not allowed to engage in any fact finding at the first stage); *Guerrero*, 2022 IL App (1st) 210400 ¶ 13 (" 'no factual findings of credibility determinations' " are [permitted] at the pleading stage of postconviction proceedings.' [Citation.]").

¶ 47    What is more, contrary to the State's position, Raul's version of what transpired prior to the shooting is not completely contradicted by the record. Contrary to the State's assertion, and consistent with Raul's account, at trial both Utterback and Valentin testified that they heard two

separate sets of gunshots and that they observed the gunman kneeling and shooting only after the first round. Neither of these victims testified that they observed the victim's group prior to hearing the gunshots. As such, their testimony nowhere contradicts Raul's statement that prior to the shooting, the victim's group had followed the shooter.

¶ 48    Vera's testimony similarly supports rather than contradicts Raul's account. Specifically, Vera testified that prior to hearing gunshots, she observed the victim's group walking back and forth along the street.

¶ 49    While the State is correct that in contrast to Raul's version of events, Matias testified that he did observe the shooter prior to hearing gunshots and that the shooter was following the victim's group, instead of vice versa, it is also undisputed that Matias did not witness the entire incident without interruption. Instead, Matias first observed the victim's group while parking his vehicle. He then passed the shooter on the street while walking to his home. Finally, Matias observed the actual shooting only after he entered his house, closed the door, and looked out of the window at the intersection. Raul, on the other hand, testified that he was with the victim throughout the incident and observed the events both leading up to and during the shooting from that vantage point. Any discrepancies between these two accounts may not be resolved at the pleading stage of postconviction review. See *Robinson*, 2020 IL 123894, ¶ 60 (the fact that the evidence presented by a petitioner is contradicted by the State's trial testimony does not mean that the evidence is positively rebutted by the record).

¶ 50    Under this record and taking into account the low burden placed on the petitioner at the first stage of postconviction proceedings, we conclude that it is arguable that the evidence in Raul's affidavit stating that the petitioner did not shoot the victim is so conclusive as to probably change the result on retrial. See *e.g.*, *White*, 2014 IL App (1st) 130007, ¶¶ 26-33 (a murder witness's

16

affidavit submitted at the first-stage of postconviction proceedings attesting that he had been with the victim during the shooting and that the petitioner was not the shooter was arguably of such a conclusive character that it was likely to change the result on retrial, requiring reversal and remand for second-stage postconviction proceedings).

¶ 51    Because we find that the petition has made an arguable claim of actual innocence, we need not address any of the remaining claims raised in the postconviction petition.  See *White*, 2014 IL App (1st) 130007, ¶ 33 ("partial summary dismissals are not permitted during a first stage postconviction proceeding").

¶ 52    Accordingly, we reverse the circuit court's summary dismissal of the postconviction petition and remand for further proceedings under the Act.

¶ 53    Reversed and remanded.